1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              CENTRAL DISTRICT OF CALIFORNIA

10

11  AMERON INTERNATIONAL              )       CASE NO. CV 12-8582-R
    CORPORATION, AMERON B.V. and      )
12  GREENWICH INSURANCE COMPANY,      )       FINDINGS OF UNCONTROVERTED
                                      )       FACTS AND CONCLUSIONS OF LAW
13              Plaintiffs,           )       IN SUPPORT OF JUDGMENT
                                      )
14         vs.                        )
                                      )
15                                    )
    AMERICAN HOME ASSURANCE           )
16  COMPANY,                          )
                                      )
17              Defendant.            )
                                      )
18  _____       )
    AND RELATED COUNTERCLAIM          )
19                                    )

20

21                      **FINDINGS OF UNCONTROVERTED FACT**

22         1.      Ameron International Corporation (AIC), along with its wholly-owned subsidiary

23  and licensee Ameron B.V. (collectively, "Ameron"), is an international manufacturer of paint

24  coatings.

25         2.      In approximately 1998, Sable Offshore Energy, Inc. began construction of separate

26  onshore and offshore facilities for the production of natural gas/natural gas liquids in Nova Scotia,

27  Canada.  Ameron contracted with Sable Offshore Energy, Inc. to provide paint coatings for both

28  the onshore and offshore facilities (the "Sable Project").

1      3.      Amercoat 132 was a primer coating manufactured and sold by Ameron B.V. for use

2  on the Sable Project.

3      4.      PSX 700 was a polysiloxane topcoat manufactured by AIC and used on the Sable

4  Project.

5      5.      Amercoat 132, when combined with PSX 700, formed the two-coat protective

6  coating "Amercoat 132/PSX 700" (hereinafter "Amercoat 132 system").

7      6.      Ameron B.V. submitted the Amercoat 132 system to two different outside testing

8  facilities for performance testing under the Norwegian Technology Standards Institute NORSOK

9  Revision 2 test program to determine if it satisfied industry standards.

10      7.      The test results for the Amercoat 132 system were inconsistent.  The Centrum voor

11  Onderzoek en Technish Advies (COT) laboratory reported to Ameron B.V. that Amercoat 132 had

12  failed certain NORSOK Revision 2 test requirements, whereas Corrosion Control Consultants and

13  Labs, Inc. (CCC&L) advised that Amercoat 132 had passed the NORSOK Revision 2 test

14  requirements.

15      8.      In light of the conflicting test results, Ameron B.V. began conducting internal

16  performance tests in January 1998.

17      9.      The results of Ameron B.V.'s internal testing indicated that the Amercoat 132

18  system had failed certain performance tests.

19      10.     Ameron B.V. began selling the Amercoat 132 system to paint subcontractors in

20  May of 1998 for application on the Sable Project.

21      11.     The Amercoat 132 paint system was supplied through both Ameron B.V. and

22  Canadian licensee, Amercoat Canada, and the sales continued during the course of Ameron B.V.'s

23  product performance testing.

24      12.     To avoid supply interruptions to customers then receiving the Amercoat 132

25  system, Ameron B.V. substituted a different primer (Amercoat 68) without advising its customers.

26      13.     The substitution of Amercoat 68 as a primer continued until November 1998 when

27  Ameron B.V. reformulated the Amercoat 132 system.

28      14.     Paintwork on the Sable Project facilities was completed in 1999.

15.   By no later than May 2001, AIC had received reports of premature coating breakdowns at the Sable Project offshore facilities.

16.   In response to those reports, Ameron sent a representative from AIC, James McCarthy, to investigate the reported damage at the Sable offshore facilities.

17.   James McCarthy served as AIC's Technical Service Manager from 2000-2004.

18.   James McCarthy conducted his inspection of the Sable offshore facilities at the direction of AIC's then-Vice President of Worldwide Technology, Christine Stanley.

19.   In late May 2001, James McCarthy, along with representatives of Amercoat Canada, Sable, and several of the Sable Project coating applicators, conducted an onsite inspection of the Sable offshore facilities and confirmed various coating breakdowns at the offshore platforms, including cracking, flaking, disbondment, and delamination of the Amercoat 132 system.

20.   Following his May 2001 inspection, James McCarthy had discussions with both Christine Stanley and AIC's then- President of the Coatings Division, Steve Dickey, about the inspection.

21.   Mr. McCarthy also drafted a written report of his inspection entitled "Report on Visit to Sable Offshore Energy Project Thebaud and North Triumph Offshore Installations."

22.   Mr. McCarthy's report confirmed rusting, rust staining, corrosion, and flaking of the Amercoat 132 system at the offshore facilities.

23.   Reports drafted by the coating applicators in attendance at the May 2001 inspection also indicated coating breakdowns at the onshore facilities.

24.   Mr. McCarthy's written report was circulated to senior management at both AIC and Ameron B.V., including Steve Dickey and Christine Stanley.

25.   In April and May of 2002, Mr. McCarthy sent letters to Sable representative Tony Semerad with coating repair recommendations for the offshore facilities, and coating specification revisions for both the offshore and onshore facilities.

26.   During the mid-1990s until approximately 2006, Christine Stanley, James McCarthy, and Steve Dickey, all were members of AIC's Claims Committee.

27.     AIC's Claims Committee was responsible for resolving monetary claims by customers regarding complaints of product performance, among other things.

28.     As members of AIC's Claims Committee, Steve Dickey, Christine Stanley, and James McCarthy all had authority to receive notice of claims reported to them.

29.     AIC's Claims Committee had authority to resolve claims of $100,000 or less.  If a claim exceeded $100,000 Steve Dickey would have been authorized to resolve the claim following approval by AIC's Chief Financial Officer.

30.     At no time did AIC's Claims Committee interact with AIC's Risk Manager, Doris Johnson, nor was it required to do so in order to resolve customer claims regarding AIC's products.

31.     On July 25, 2002, AHAC issued Commercial General Liability (CGL) Insurance Policy No. 544-25-16 to AIC for the period July 1, 2002 through June 1,2003.  AHAC issued two renewal policies for the periods 6/1/03-6/1/04 (Policy No. GL 544-65-73) and 6/1/04-6/1/05 (Policy No. GL 360-23-12) (collectively, "the Policies") which, for purposes herein, contained substantially similar language.

32.     The Policies' Insuring Agreement states that this insurance applies to "property damage" only if the property damage (1) is caused by an "occurrence" that takes place in the "coverage territory"; (2) occurs during the policy period; and (3) "Prior to the policy period, no insured listed under Paragraph 1. of Section II -Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the . . . 'property damage' had occurred, in whole or in part."

33.     The Policies' Insuring Agreement also states that "[i]f such a listed insured or authorized 'employee' knew, prior to the policy period, that the . . . 'property damage' occurred, then any continuation, change or resumption of such. . . 'property damage' during or after the policy period will be deemed to have been known prior to the policy period."

34.     Under the terms of the Policies, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

35.     The Policies define "property damage" as:  " a. Physical injury to tangible property,

4

1    including all resulting loss of use of that property. All such loss of use shall be deemed to occur at

2    the time of the physical injury that caused it; or b. Loss of use of tangible property that is not

3    physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence'

4    that caused it."

5        36.    The Policies provide that "'property damage' will be deemed to have been known

6    to have occurred at the earliest time when any insured listed under paragraph 1 of Section II -Who

7    is an Insured or any 'employee' authorized by you to give or receive notice of an occurrence or

8    claim: … (3) Becomes aware by any other means that. . . 'property damage' has occurred or begun

9    to occur."

10       37.    In October 2004, AIC, Ameron B.V., and others were named as defendants in a

11   civil lawsuit filed by Sable in the Supreme Court of Nova Scotia entitled *Sable Offshore Energy*

12   *Inc, et al.. v. Ameron International Corporation, Ameron B.V. and Amercoat Canada, et al., Hfx.*

13   *No. 220343* ("Sable Action").

14       38.    The Sable Action alleged claims of negligence and negligent misrepresentation

15   against Ameron related to its sale and faulty performance of the Amercoat 132 system.

16       39.    AIC tendered defense for the Sable Action to both AHAC and Greenwich

17   Insurance Company ("Greenwich") on October 13, 2004.

18       40.    Following an investigation of the claims alleged in the Sable Action, AHAC denied

19   coverage on the basis, among others, that AIC—and Ameron B.V., to the extent it constituted an

20   insured under the Policy—was aware of property damage at the Sable Project prior to the Policy's

21   inception on July 1, 2002.  AHAC reserved the right to deny coverage on additional grounds,

22   including that the allegations in Sable's Statement of Claim did not constitute an "occurrence"

23   covered by the Policy, and that certain policy exclusions applied to preclude coverage.

24                                  **CONCLUSIONS OF LAW**

25       Having made the foregoing findings of uncontroverted fact, the Court hereby

26   concludes as a matter of law that:

27       1.    Summary judgment is appropriate only when the pleadings,

28   depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

2. Whether an insurer has a duty to defend can be resolved on summary judgment as a matter of law.

3. To protect an insured's right to call on the insurer's superior resources for defense of third-party claims, California courts have been consistently solicitous of insureds' expectations on this score. Any doubt as to whether the facts establish the existence of a defense duty must be resolved in the insured's favor. *Montrose Chemical Corp. v. Sup. Ct.*, 6 Cal. 4th 287 (1993).

4. Comparing the underlying allegations of the complaint with the terms of the Policy, Plaintiffs have met their initial burden of showing a prima facie case of coverage, i.e., there was an "occurrence" under the Policies and property damage during the policy periods. While AHAC presented evidence showing Ameron may have intentionally supplied defective paint, a reasonable jury could find that Ameron's conduct was the product of negligence. *See Anthem Electronics, Inc. v. Pacific Employers Ins. Corp.*, 302 F.3d 1049 (9th Cir. 2002).

5. Ameron employees authorized to receive notice of an "occurrence" or claim had been notified of paint system failures throughout the project by no later than May 2001, before the inception of the first AHAC Policy. Thus, the Policy's prior knowledge limitation precludes coverage.

6. The Policies do not require that AIC's Director of Risk Management have knowledge of alleged property damage at the Sable Project facilities in order to trigger the Policies' prior knowledge limitation.

7. Ameron's interpretation of the Policies' notice provision would impermissibly alter certain coverage provisions and render others meaningless. *See Headlands Reserve, LLC v. Center for Natural Lands Management,* 523 F. Supp. 2d 113 (C.D. Cal. 2007). Moreover, Ameron's interpretation of the notice provision would permit Ameron to avoid the prior knowledge limitation merely by insulating its Director of Risk of Management, Doris Johnson, from any knowledge of the claims.

8.      Property damage at the onshore facilities is a continuation, change or resumption of the coating failures at the offshore facilities, of which Ameron had knowledge before the Policy's July 1, 2002 inception.  Ameron's knowledge thus precludes any possibility of coverage.

9.      Based on the undisputed material facts, AHAC never had a duty to defend Ameron in the underlying Sable Action.

10.      The issues of whether Ameron should be estopped from obtaining coverage and whether Ameron BV was an insured are moot in light of the Court's ruling that the Policies' prior knowledge limitation precludes coverage.

Dated:  June 5, 2013.

_____
MANUEL L. REAL
UNITED STATES DISTRICT JUDGE